Good morning to all of you and welcome to Argument in Kennedy v. Bremerton School District. Mr. Anderson, you are representing the appellate. Do you want to try to reserve any time or are you just going to kind of decide as you go along? Judge Smith, I would intend to reserve three minutes. I'll keep my eye on the clock. Very well. Please proceed then. Thank you, Judge Smith, and may it please the court. Devin Anderson on behalf of Coach Joseph Kennedy. Coach Kennedy sought to take a knee after the football game had concluded to say a brief silent personal prayer as the players were singing the fight song elsewhere and the crowd was dispersing. The district said no. Coach Kennedy cannot engage in demonstrative religious activity if he's at work and in eyesight or earshot of students or the public because that would violate the establishment clause. The district was wrong. Brief personal expression like Coach Kennedy's to carry the imprint of government sanction. Mr. Anderson, let me just ask you this. I have heard, of course, in the previous iteration of this case about the coach's brief personal prayer, but the reality is, is it not, that Coach Kennedy approached another coach in 2015 asking that he and his players join him in prayer on the football field immediately after the game. On October 16th, if I recall the date correctly, having previously spent time on Facebook in local churches, on a TV show, and in the Seattle Times telling everybody he was going to go out there and pray, he was photographed with, I don't know, I didn't count everybody, but it looked like at least two score people plus four television cameras taking pictures and it was certainly not just a minute, and then it went on for two more sessions. So let's be truthful about this. The coach didn't have a moment of silent prayer. He engaged in prayer, a Christian prayer, in sight of a lot of people, and he had told that was exactly what he was going to do. Isn't that the truth? No, that's not true at all, Judge Smith. Okay, tell me why. Yes, let me break that down a little bit. So I think you're referring to the October 16th game, which was against Centralia. Before that, to his asking an opposing coach to come with his team to join him on the 50-yard line and pray. Right, so I think we need, there's a distinction here that I think your question relies, and that's the distinction between the conduct that it took place between before September 17th, 2015, which was when the district gave him a directive that he was not to engage in demonstrative religious activity with students, or at the same time students were engaging in other demonstrative activity. And I think there's no dispute that after Coach Kennedy received that directive, he never again sought to involve students in his prayer. Now, I want to come now to the game that took place after September 17th, this October 16th game, Judge Smith, that you were referencing. Let me just be sure I understand. So you say he never sought to engage the students. So the fact that he had the newspaper interview, the fact he had the TV interview, the fact he was on Facebook, the fact he went to local churches telling them what he was going to do, is not to be construed as an incentive for adults and students to join him on the field? Is that what we're to understand? I think that is what you're to understand. So I want to be clear about the impetus for the Facebook activity that you're referencing. And I think the timeline here is important. When we look at what happened was the district told him right before a game in September that he can't pray anymore. He did that. He was told after the game by one of the assistant coaches that they're going to fire you. He was upset about that and he posted to Facebook and that went viral and that prompted the September investigation that led up to the district's directive on September 17, 2015, that Coach Kennedy was not to engage in demonstrative religious conduct while with students or at the same time students were engaging in their own demonstrative religious conduct. And there's no dispute that he's complied with that directive. Now is the district... Wait, wait, wait. You say there's no dispute that he did comply? I thought the district court found just the opposite. He 100 percent complied with the September 17, 2015, directive. What happened, and as the district court found, he never engaged in prayer with students. And that's at excerpts of record six. But what the district then did is after Coach Kennedy notified the district of his intent to continue a personal prayer, separate and distinct and apart from the students, then the district said no. And the line that the district drew was firm and it said no demonstrative religious activity readily observable to students and the public while he's on the job. And you can look at ER 100, that's the district's October 23, 2015, letter. And the district itself recognized the conduct at issue. And I would direct you to Dr. Lavelle, who is the sole decision maker, the district superintendent, recognized, and this is at ER 267, as well as ER 39. These are his contemporaneous emails to members of the school board or the state superintendent. In Dr. Lavelle's own words, the issue has shifted from leading prayer with student athletes to a coach's right to conduct a personal private prayer at the 50-yard line. Those are Dr. Lavelle's own words. Except counsel, except counsel, I'm with Judge Smith on this and I really need you, if you could back up. The question had to do with we keep hearing out about a brief personal private prayer. But the, and I think this case would change dramatically if I saw facts that told me there was a brief personal private prayer going on. So for me, this is really pivotal. And after, I appreciate that, I have a timeline too, I agree with you, the timeline's critical. So we have the September 17th letter. But then in October, he's making media appearances again to share the word about what he was doing. The Seattle Times published the story before the October 16th game. And then I believe it's pretty clear he continued to pray October 6th with other people, with students, and we have the photos showing them all huddled around him with media, October 16th, October 23rd, and again on October 26th. So I just strain to see this being a brief personal private prayer. So Judge Christen, you're incorrect in one respect. There is no evidence that any student joined him on October 23rd, or that anybody joined him from the crowd. So if you look at ER 271, that's the excerpt, that's the video that we submitted of the October 23rd game, I think you'd be hard pressed to even see Coach Kennedy. That's how inconspicuous his conduct was on that day. One of my questions was, forgive me for interrupting, one of my questions was going to be that. I think we have video evidence or at least photographic stills of October 16th in the record and October 28th in the record. So you're correcting me and anticipating one of my questions about October 23rd, which I appreciate. Nevertheless, I still struggle with this being a brief private personal prayer. The media was present in force and he had talked with the media to tell him this was going to happen. At that point, it just seems to me the district is so hard pressed. Really, their back is against the wall because they've got to avoid, as I'm sure you'll agree, an establishment clause violation. So can you help me out with that? Yeah, so I want to break that down because I do think, as you say, the timeline is important. So two occasions, there are two occasions after September 17th, 2015, where individuals came down on the field to show support for Coach Kennedy. That's the October 16th game and it's the October 26th junior varsity against North Mason. That was the very last game before Coach Kennedy was suspended by the district. There was also the October 23rd varsity game. There is video evidence. You look at excerpts of record 271 when we submitted the videos to the court and you can see Coach Kennedy kneels. You have to watch it a couple times to actually figure out who he is because there's nobody who comes down to show support. He is just taking a quick after the handshake is concluded. And the district said that that was still unconstitutional. That's an excerpt of record 44. And so the district itself recognized that the prayer at issue that Coach Kennedy sought to engage in was a brief personal prayer. Again, I'll point you to Superintendent Lovell's own contemporary. Excuse me. You're saying the district recognized that? Yes. I don't know how we take the October. I don't mean to go on a tangent, but I don't know how we take the October 23rd episode out of context of the history of all that's happened here, especially because the media was ramped up and players and legislators and members of the public were involved in the whole saga, the whole story. So who ramped them up? Who invited them after that? And particularly after October 26th, you said in your brief extensive summary should cause us to re-evaluate what happened. But our panel held that the speech at issue involves kneeling and praying on the 50 yard line immediately after games while in view of students and parents. And the date talking about the parents came down on the field and the media came down was at the invitation of your client. Was that true? No, that's not true. Coach Kennedy testified, and this is unrebutted in the record, that he did not invite anybody to join him, period, on the field. That's an excerpt from the record. With respect, you're obviously a really smart guy. Do you really want us to believe that somebody who's gone to this much publicity sought the publicity, I assume at the request of counsel, and done everything he could to put out there what was going on, that he did not suspect this was going to happen? For example, in the district court, ER 8, district court's summary judgment, even if we skip the 23rd, the district court says during line 10 that the October 28th other adult son just stumbled on the field. They were told this was not for there to be. The school district made that very clear. And then it says once the players finished their fights on, they joined Kennedy in the middle of the field after he had finished his kneeling prayer. Now, the reality is you're asking us to just pretend that this was not an orchestrated situation and that the school district had nothing to fear about an establishment clause violation. And I really find that difficult. How do we get around this environment in which Coach Kennedy seemed to be saying to the school, hey, you know what? This is what I'm going to do, according to his lawyer. I'm just going to keep doing this. If you don't like it, I'm sorry about that, but that's what I'm going to do, and I'm going to majority of his players showed up when he didn't pray. Nobody went out. It didn't just like classic establishment clause concern for the district. Not at all, your honor. I want to make two points in response to your question. I think point number one is your question, I think, blends together two distinct types of conduct. There was the conduct that happened before September 17th, 2015, where Coach Kennedy and his prayer was involved as part of this post-game pep talk with students. That's not disputed. That's something that happened. But then the district court, again, for eight years, nobody told Coach Kennedy that was a problem. Then there's an investigation, and the district says, you cannot do that. You cannot engage in demonstrative religious activity with students, or at the same time, students are engaged in that. And so Coach Kennedy complies with that directive. He never again engages in demonstrative religious conduct with students, or at the same time, students are engaged in other types of conduct. And we think, if anything, the distinction between his pre-September 17th conduct, where he's visible doing this with students, and the post-September conduct, where he's visible doing this completely separate and apart from students. You talk about, and the district court talked about, well, he did this prayer, and then he rejoined his team. And I think that a reasonable observer watching that and knowing the history would recognize, well, he's doing something separate personally, and then when he rejoins the team, that's when he's engaged in the expression, the official type of expression that is much closer to within the scope of Johnson and in cases like that. Counsel, right there, can I just clarify, when you said he never again prayed with the team again, we've walked through the October 23rd episode, but the games on either side of that, we have photos of, it looks like team members right around him praying with him. So tell me, what am I missing there? So I want to make two points. And members of the press as well. Two responses to that, Judge Christine. There's the October 16th game, there's evidence showing that members of the opposing team, right, from a different school district, joined Coach Kennedy as a show of support. There's no evidence of any Bremerton. Well, what difference does that make? I'm sorry, does that matter? Well, I think it does matter when it comes to whether or not we're talking about Bremerton school district. But more broadly, I want to make a point more broadly, Judge Christine. We're talking about coercion, the risk of coercion in an establishment clause. So before you skip this point, it's kind of a yes or no. Do you think it does matter that it was members of the other team? I think it does matter. Because there's no evidence of coercion of Bremerton school students, the students whose rights the district can enforce. But wait a minute, there is, before we skip over that point, there's parents who have come forward, my understanding, please truly correct me if I'm wrong. Timeline is so important, but I believe there are parents who came forward after all this was said and done and said that their kids have felt coerced, pressured, which is different than Coach Kennedy intending any pressure, to be sure. But youngsters reporting feeling pressured to participate. What about that evidence, sir? So that evidence, there's, I think, a couple declarations that came in again after everything, after this roundup. That evidence, it's not clear what that's referring to. And more likely than not, that evidence is referring to the practice that occurred again prior to the district's directive. Why do we say more likely than not? Why do we reach that conclusion, please? Well, that district, I mean, the district's declarations, they submitted those declarations at summary judgment after discovery was closed. Those declarations do not say whether that related to Coach Kennedy's personal practice of prayer that occurred after September 2015, or whether it was related to the team exercise. All right. I was responding to your comment, there was no evidence, but I think you've answered my question. So thank you for that. But what do we, what do we make then, Mr. Anderson, of his lawyer's letter dated October 16th, wherein the lawyer indicated that Coach Kennedy will continue his practices of saying a private post-game prayer at the 50-yard line. That's one day before you take time this October 17th magic date. So he's his lawyer, he's saying he's going to do that, and right after that, that's when Coach Kennedy went on the, well, I say media appearance approach. And I, again, does his lawyer not speak for him? Is that, is that what we're to understand? No, I think his lawyer speaks for him, and I think that's exactly what Coach Kennedy sought to engage in, right? He gave district notice that this is what he was intending to continue to do, was the personal prayer. And what was the district's response? The district's response, again, set a clear line, and this is the policy of the issue. The district said, no demonstrative religious activity if you're readily observable to students. That cannot be the case, consistent with the Supreme Court's direction in Tinker, that teachers don't, that teachers do not shed their First Amendment rights at the schoolhouse gate. Teachers and or to other students. It simply cannot be the case that just because they engage in a form of demonstrative religious conduct, while in view of students in the public, that the district gets to control everything. Is that really your position that we rely on Tinker? I mean, given the history of this, given the fact that he's out in the middle of the field, the district has told the public it cannot go there, and the Satanist group can't go there either. They were concerned about people coming on because of the publicity. You're saying that under the lights, with all the uniforms on, that it's on the school property, only the coach could have been there. You're saying that Tinker allows him to pray out there with whatever impact that might have on students and on the public without having a basically prima facie case of an establishment clause violation? Well, Joseph Smith, you have to take each case on its facts. And so I think it's important to look at the facts here, which don't fully align with what I think you set out. So the district court, for example, when talking about the fact that this took place on the field, and again, offering the prayer of Thanksgiving on the field where the game is played, that is an important aspect of Coach Kennedy's sincere religious beliefs. But is there any evidence in the record that the students ever prayed on their own? There's no evidence, Your Honor, Judge Nelson, in the record that students ever prayed on their own. But I don't think that that actually matters when it comes to the analysis here. Because? Well, because when we're talking about the coercion analysis under Lee and Santa Fe, the fact that students did not pray separately from Coach Kennedy or while Coach Kennedy was engaging in the conduct that's at issue in this case, which is, again, his desire as the district recognized. And again, I'll direct you to Superintendent Lovell's own testimony and his own emails and the October 23rd video, Coach Kennedy's desire to engage in a personal private prayer. The fact that students are separate from him, that they're not engaging in any other religious activity, that only confirms that the district was wrong, that there is anything close to an establishment clause. What do we make of the October 27th game then? Clearly, the students came out after their fight song. Clearly, there were adults there that came out who had no authorization to be on the field at all. And yet they knew that he was out there demonstrating, basically, basically showing the district he was going to do what he was going to do. Well, so, Judge Smith, I think the description you gave is often a little disrespectful. And I'll encourage you to go back and watch the October 26th North Mason Chernigovar City game video. What happens there is Coach Kennedy, after the post-game handshake, he's there at midfield. He pauses. He takes a knee. There are some individuals who come in from the stands to show support for him and join around him in the last, like, five seconds. The students are separate. Look at the video. You'll see the student-athletes are separate. They're singing the fight song. You can hear it happening off-screen. And then they rejoin Coach Kennedy for his traditional post-game pep talk. I think that separation, if anything, goes to show to a reasonable observer that Coach Kennedy is engaged in something separate, personal, and private. And let me say one more thing. Isn't that really the issue that you described? What the reasonable observer, knowing the history of Coach Kennedy's fight with the district, and what he said to the Times, what he said to the TV, what he said on Facebook, and so on, he's saying, at least as I read it, I have a belief this is what I'm going to do. And based on what my lawyer told me to do, I'm going to say I'm going to continue to do it. He's obviously put it out so that he encourages support. Otherwise, these adults that came out there on the 25th, or 26th, rather, would not have done so, would they? Well, Judge Smith, to be clear, there's no evidence, zero evidence on the record that Coach Kennedy encouraged people to come out. I recognize that the district has sort of put that gloss on the facts. I don't think that's accurate. And second of all, the Times, what about the television interview? I mean, the 26th and the 14th, and on, I mean, that's all a relatively brief time period. That alone could be enough to encourage people to come out, would it not? Well, I don't think so. I mean, Judge Smith, I think that, remember how we get here, the district issued a plainly unconstitutional directive that everything that Coach Kennedy says or does, while he's in view of students at work, violates the First Amendment. I think Coach Kennedy... Counsel, you keep... Okay. Especially because of Santa Fe, that tells us we have to look at the history, and what a reasonable... That's what Judge Smith is asking about, right? That we have to look at the history, and what would a reasonable observer think in light of the history? You are from the second letter, and I think viewed in isolation, you'd have a much stronger argument that... Or similarly, if we were just looking at the October 23rd game, you'd have a much stronger argument, because your argument is that that sweeps too broadly. But what's happening here, right, is part of a longer story, and the district was engaging in a process, trying to find accommodation for him. My understanding... Here's my question. My understanding is... Well, there's two. One is I don't know any basis that would allow us, certainly anything in the case law, that will allow us to look at those snapshots out of context of the rest of the story. And the second... Well, maybe I'll just let you answer that question first, and then I'll ask you my second question. Sure. No dispute, Judge Kristen, that the you have to divorce this from the context. But I do want to make two points in response to what you just said. I think what the district seems to be saying is that because for eight years, Coach Kennedy engaged in this sort of prayer slash pep talk with no directive from anybody at the district over the course of those eight years, that that was unconstitutional. And then the district says they didn't know about it. The district says they didn't know about it, but okay. Okay. You can... I question the plausibility of that assertion, but there's no evidence of the record in that. So... But what the district is saying is because he did that, and then he was told not to involve students, which again, he did not intentionally involve students. He tried to separate himself from students. Is that then Coach Kennedy has to wear some sort of scarlet letter that gives him second class First Amendment rights as compared to a new coach. So let's take a hypothetical. Let's say a new football coach showed up and started to offer the brief personal prayer at midfield after the game had concluded. Would the district have taken the same action? Under the policy they announced, they would. That coach, like Coach Kennedy, would still be at work. That coach, like Coach Kennedy, would be visible to the students or public. So... And again, to the extent that you think that the pre-September 17th, 2015 history should come into play, that history, if anything, strongly supports Coach Kennedy. Because what are the aspects of that history? Coach Kennedy prayed with the team. He was told not to pray with the team. Do not pray with students. As the Superintendent Lovell recognized, if you look at his correspondence, the issue shifted. He's not trying to pray with students anymore. He's trying to engage in a personal private prayer following the district's directive. Coach Kennedy has no dispute. No problem. If the district wanted to enforce his rules about not letting people onto the field, no problem. That doesn't interfere at all with Coach Kennedy's sincere religious beliefs. Council, my second question is about... Thank you for that response. I appreciate it. My second question goes to the statement in the second letter that you're stressing today that you think sweeps too broadly. And as I said, as I think of it read in isolation, it might. But again, you've answered why we should be allowed to try to reach an accommodation. And as I read that correspondence back and forth, the question is, am I correct that Coach Kennedy insisted that it had to be at center field, under the lights, and before the crowd left? I think a couple... Let me parse those real quick. Under the lights, irrelevant whether lights are on or lights are off. Doesn't matter. But it's a yes or no. Wasn't that his response? No, no. His response was praying on the field immediately after the game. Now, whether people were present or not, that's irrelevant to him. That is irrelevant to his religious belief. Well, my understanding is that for some period of time earlier, the district allowed him to pray on the field where the game had taken place after his duties were done and after the stands had emptied. And in the process of this accommodation, I think... Please correct me if I'm wrong. My understanding is that the choice he gave the district was that the only accommodation that was going to be acceptable was on the field, under the lights, while the fans were still there. Have I got that wrong, please? I do want to clarify. I think you've got a portion of it right and a portion of it wrong, Judge Christy. So the one thing that I want to correct, you're referring to the game that occurred at September 18th. It's immediately after the district's first directive. That is the game where Coach Kennedy did not pray immediately after the game had concluded. He just gave a pep talk. Everybody leaves, Coach Kennedy is driving home, and he felt, in his words, dirty. He felt like he had been ungrateful by delaying the expression of gratitude. So that game and that game only, he drove back and went ahead and said a prayer afterwards. But he was clear that that delay was incompatible with his sincere religious beliefs. So he didn't do it I understand. Okay. And so then when we get to, we can fast forward, you're looking at the second letter and taking strong issue with the soundbite we've talked about today. I'm pushing back about whether we can view that out of context, but be that as it may, in the process of the district and Coach Kennedy trying to reach accommodation, did he give them a different choice other than out on the field while the fans were still there? So while the fans were still there, Judge Kristen, is not any aspect of what Coach Kennedy was trying to do. But let me answer the question about accommodation. The question about accommodation is the district's accommodations were flatly and facially incompatible with Coach Kennedy's beliefs by saying, you've got to go pray, not on the field. You have to go pray. And his beliefs required him to pray. That's the sign trying to get at. And I know you're running out of time. So I want, it's important to me. His beliefs required him to be center field immediately after the games. Necessarily, that would mean before the stadium empties. Have I got that wrong? Now's the time to tell me. That's generally correct. I think that whether or not there are people in the stadium, Judge Kristen, is irrelevant. The relevant point from Coach Kennedy... You mean irrelevant to Coach Kennedy, certainly not irrelevant to the district. That's what you mean. That's what I mean. That's what I mean. I want the record to be clear because I think this court's prior opinion talked about how Coach Kennedy was directing his speech to the students and the public. I think Discovery has clearly refuted that. And what this case comes back to, in my mind, is the district's policy, which on its face violated Coach Kennedy's free exercising. We understand your position about this, but in what way did Discovery refute what had been said before on that point? Well, I think this court previously, Judge Smith, had written that Coach Kennedy directed his speech to students and members of the public. I think that Discovery has refuted that completely. In what way? Coach Kennedy testified it was preferable if nobody was around him when he prayed. But doesn't that get back to what my colleague just pointed out? Does not the record show that when he got the letter from the district initially, he did go after the game and he prayed? I know you were saying he felt dirty and all that sort of thing, but the reality is he did try to comply and then he came back and his lawyer made it clear he was going to the yard line immediately, immediately after the game was over, which by definition means that people would still be in the stand and the students would still be there. And that's what the district understood. So I'm puzzled, frankly, it's your comment that Discovery changed anything about what had been previously said about the environment that the Santa Fe concerns that we have. Well, I mean, I think Judge Smith, I think Discovery has shown that, as I said, and we've written our briefs, we've identified the specific points from this court's prior opinion that I think the facts have disproven. In particular, the fact that his speech was directed at others in the audience, the fact that this court said it's essential to Coach Kennedy that his speech be delivered in the presence of others. That's not true. That's been directly refuted by the record. I see my time is up and I did want to reserve some, so let me. You don't really have to reserve, but we may give you a little time after we hear from the opposition. Thank you. Very well. So, Mr. Tierney, as I understand it, you're going to take how many minutes, 23 minutes, right? Yes, Judge Smith, I had to get my microphone on. I would like to take 23 minutes and Mr. Katsky will use seven minutes. Very well. And I want to make sure I leave enough time for Mr. Katsky, so I'm going to cut myself off abruptly when I get to 23. Either that or quit ahead of time unless you're keeping me after school there. So, I think I have to start by going back over the facts, which is, of course, a good way to start in any case. What the exercise you just went through was really sort of hopscotching around or cherry picking around and looking into the bark of the tree here and there without really paying attention to the forest. What, if I can go through the chronology a little bit, what happened in this situation was Mr. Kennedy started praying on his own some years ago and students started to join him a little bit at a time. And eventually that evolved into a situation where over the years the entire team was gathering around him when he prayed. Ultimately, it became a sort of a group prayer when other members of other teams came in. Mr. Kennedy would hold up a helmet from each team, recite a prayer, standing in the middle of the circle. Eventually, it came to the attention of the principal when another school official from another school told him about it. And that's when the school got together with Mr. Kennedy, wrote that initial letter, and I think it was September 17th, and said, you know, we haven't had good training about this, but you can't do this, basically. Counsel, I don't mean to, we are really familiar with this timeline. Well, I, but I want to talk about that in relation to the questions you were asking. Okay. I needed to, I need to set that stage. I have another question and I'll get in in case I don't get it in. Is there anything that the coach could have said to the students at that time that would have been outside the scope of his duties? When you say at that time, do you mean at the meeting, at the center of the field, after the game? After the game, on the 50-yard line and meeting. Is there anything that he could have said that would have been outside the scope of his duties as you have defined them? I, I just don't see how that's possible. And I'll, and I, I'm not, this isn't in the record, but having been a coach myself, you meet with the players after the game, you're talking about the game. You're, you're still the coach. Anything you say or do, I mean, if you have a temper outburst, you're, that's still an expression as a coach. So I don't think there's anything he could do in that post-game meeting that isn't an action as a coach. But Garcetti teaches, and the Supreme Court has reminded us, it's not infinitely elastic, and we have to be concerned about how job descriptions are, are described, I guess I would say, or defined. So is it, is it your position that there is no time where he could step aside and have a private communication outside the scope of his job duty? I don't think I would categorically say no time at all. There are outer limits to the principles that are being applied here. I don't know if I can define exactly where those outer limits are, but I would say that what we're dealing with in this case falls far short of the outer limits. I don't think there's any question about this particular behavior. And I would like to give you, you know, a really right on the head answer on exactly where the line would be drawn between what he can say and when it's personal and when it's not. I believe that line exists somewhere, but I don't think that's what's at issue here. I'm going to say this so the opposing counsel have an opportunity to respond as well. It seems to me that one may be temporal. It may be possible to step aside briefly, and as the Supreme Court has postulated, you know, as one would to make a quick phone call home or something, walking back to the locker room or what opportunity for a quiet moment, even though the students are around. The other, I think, might have to do with the extent of just how demonstrative the speech is. So the record has another coach who's, as you're very familiar, I think Coach Boynton, who apparently was taking a moment to engage in his own prayer of thanks, and people weren't even aware of it because it involved him simply closing his eyes and saying his prayer silently. What do you think about that during the course of these job duties? Would that have been possible? I think that there are probably moments in the course of a coach's job where he would be completely separate. Again, I don't think we come close to that moment. What I would point out, let me use the example of a cell phone call, a phone call, and I will find a citation for you in the record, but in Mr. Kennedy's deposition, I asked him specifically, let's say you've got a contractor working at your house and the job has gone bad and you have an angry, cussing conversation on the phone and the students are around. Do you think at that point you're setting an example for the students? Do you think that you have to be careful that being a role model still applies at that point? And he agreed. He said, yes, everything we do in front of them sets an example. Well, sure it does, but does that mean that there wouldn't be an opportunity for a coach to give thanks for a meal? What if they're going out to the part of the deal as a banquet at the end of the season or something like that, or some kind of a celebration where he's giving thanks briefly, privately, because nobody's been injured, for example? I think it seems to me that would be, and there's students around in this hypothetical. I think you are moving closer to the outer limits of what this would be. You mean the opposite end of the spectrum of acceptable? Is that what you're saying? Yes, I think if we're talking about applying this rule, everything the coach does in the view of the students when he's on duty and in an official capacity is speeches in the course of this job. Yes, I think there's outer limits to that, and you might be approaching that. Opposing counsel has asked, and we put him through his paces, although he held up very well, and I appreciate his patience with our questions, but he's focusing real hard on the second letter and essentially saying, I am paraphrasing unfairly, but the September 17th letter said one and the second letter reneged and swept too broadly. If the second letter were read in isolation, do you agree it would sweep too broadly? Well, no, I don't, and there's two reasons. One, I think that the behavior that that letter was responding to was this mass rushing of a dangerous situation. People were observed tripping, falling, band members got knocked down. That implicated safety issues for the district as well as establishment clause concerns. What I hear you saying is that you can't read the letter in isolation. That's what I really heard you saying because of the history, but if it were read in isolation, wouldn't the statement be concerning? I think I'd have to parse the statement again. I mean, if the statement is demonstrably... Let's make it a hypothetical statement because I'm not going to quote it for you because I don't want to take your time, but if the hypothetical statement were, you know, if a school district said no demonstrative religious activity, if the students are around, if a district said that in a vacuum... I think if that was said as a vacuum, it would leave out important elements of what the test is. Right, because I don't think it would allow a teacher to bow her head in the cafeteria and give thanks for her lunch. I agree. I think that the missing element in those, which the court has discussed in the previous opinion and which I think is the most sensitive and the most critical one, is that the coach has to be acting in what is reasonably viewed as an cafeteria. So let's say that's her duty to supervise in the cafeteria. I don't want to take you too far afield, but would you really object to that teacher bowing her head to give thanks for her lunch? I don't think she's acting in her capacity when she's about to eat her own meal. These are all very fact sensitive. You're throwing some more facts in there. Maybe that not acting in an official capacity would have a much different spectrum of behavior available to them. But that's why this case is so true. One of the reasons it's so tricky and so important, right? One of the things coaches are supposed to do is give motivational speeches. And for high school kids, a coach can be center of the universe, just terribly important too. So it seems that's why this is so very difficult to parse. That was something I wanted to get at earlier with one of your questions, Judge. The context of this also includes, it's not just coaching, it also includes what are the expectations and what is the power that is available to the coach as an influencer, as a communicator at this particular stage, at this particular event. There are only a few of these football games in a year. There are only, some players never play much. Some players, you know, it's only their senior year, but there's maybe 10 or 11 of these events. The coach's behavior at those events is much, much more under the microscope. These are the pinnacle of that high school experience, that high school athletic experience. And I was talking about outer limits. You could conceivably move farther away from this, closer to the outer limits, if this was some isolated event in a practice, or in a weight room, or some little thing like that. Counsel, time is fleeting. Could I ask one quick question here? Yes, Judge. The District Court said we are aware that there are concerns about the coach, that we disassociate ourselves with anything that he says on or off the field, and take care of the potential establishment cause. I don't think so at all. The, you know, no matter what the district says, the coach is still the coach. He's still a district employee. He's still acting at a district event. You can call it whatever you want, but I think Abe Lincoln said, you know, how many legs does a lamb have if you call his tail a leg? And he said it's still got four. It's still got four. You know, you can call him anything you want, but he's the coach at a critical time, doing a demonstration in the center of the field, and the district can't just disown that by saying, oh, never mind. It's not, it's not, it's not to speak on behalf of the district. Thank you. You have answered the question, and I'm aware of your time. Can I, can I shift the focus just a little bit? I gather your answer to the previous question that we have to consider this in light of Santa Fe. The letter cannot be second point here. Your, your opponent suggests that we really need to examine the constitutionality of the district's conduct under the Church of Lacumi case. And under those circumstances, let's just say we agree to that hypothetically. In that case, if you apply the facts as the appellate would like, they're going to claim that we should consider this under scrutiny. And there are, of course, are two parts. The one is whether, the first one, whether or not the district has a strong position it has to fulfill, i.e. that you don't want an establishment clause violation. I gather you would cite good news for that one, that you can do that. But what about the, the accommodation issue that Judge Kristen mentioned? What, what did the district do all that it could to reach an accommodation with Coach Kennedy? Thank you, Judge Smith. This brings me back to the track I was on earlier when I was talking about the context of this and the history. Once the district had issued the directions to Mr. Kennedy, and then weeks later the issue arose again with this letter from his lawyers, the position taken by Mr. Kennedy was specifically that the district had to rescind its previous directives. And he was saying that he was going to pray with students if they joined him. And he never changed that position. And his lawyers made it clear that that was the only acceptable position for him. And that's why the prior events inform our understanding of what was going on as the district tried to move forward and reach some accommodation with Mr. Kennedy. And in response to your question, Judge Smith, the district, it was a one-sided discussion. There was never a response other than the terms of our letter are the only acceptable terms. Are there additional, if you will, discussions between the district and Mr. Kennedy's counsel that are in the record in terms of trying to reach an accommodation? I don't believe they are in the record. Other, there is a statement in the record. I believe it's in the superintendent's declaration. And I could find that site for you where he's saying that the responses to the district only came through announcements by the lawyers to the press. That the statements made in interviews or whatever by the lawyers were all that the district knew about Mr. Kennedy's position. That there was no direct response and there was no change of his position. Let's put it that way. And that there was certainly, despite multiple requests, Mr. Kennedy never came in to see his boss. You said multiple requests. Where should we look in the record to find the district's, if you will, repeated requests to discuss with Mr. Kennedy or his lawyer what might be an appropriate accommodation? Each of those letters, there were three letters to Mr. Kennedy after October 16, including October 16, I believe. And each of those requested that he come in. And I see that my time is up. Okay. I think perhaps, okay. I thought they gave you 23 minutes and then you were going to... Oh, I'm sorry. I was trying to, no, it's not. I think you've got more time. Yeah. I saw the seven minutes there. My mistake. So the three letters that you're referring to are in the record, right? Yes, your honor. And they've never received any, received no response other than according to the superintendent comments by counsel for Mr. Kennedy to the press. Correct. And in his deposition, Mr. Kennedy confirmed that if students had joined him, and in fact, we know of the, what was two school aged children that joined him. We don't know that they're Bremerton students, but they had joined him as prayer in the last incidents on October 26th. But he testified in his deposition that he would still have prayed with them if they, if students had joined him in the field. So the district, the district's concerns that he was sticking by his non-negotiable demands were confirmed by his deposition. At what point in the timeline did coach Kennedy make this statement? Again, I'm paraphrasing, but there's a statement in the record. We've read several times that a student asked that they could pray with him. And his response was it's a free country and you can do what you want to do. Do you remember when he said that? His description is that that is something that occurred years before. Thank you. That, that, that started it, but you're pointing out something that's important in the district's consideration. Mr. Kennedy wanted to resume his prior practice. His prior practice started out as him praying alone. And then he would pray with whatever students came and wanted to pray with him. There was no statement, no, no sense at all from Mr. Kennedy that he was going to change that. And that's the situation that evolved into a group prayer out there with a bunch of students. And this is a district's concern that once some students started praying with the coach who has the power over who plays and who doesn't play, other students will feel coerced to join in the prayer, to not be left behind. And there was no change, no statement of changing from that previous evolution that had occurred when he'd started out him praying alone and then others joined him. And this was pointed out in the district court opinion that this was just going to be, as he said, I'm going to go back to what I was doing. And what he was doing ultimately evolved into the whole team praying with him, even players who didn't really want to, who felt that they had to go along with the crowd. Something very understandable for a high school kid. Opposing counsel? Oh, go ahead, Judgeman. Is it fair to say then that, at least from a district perspective under the Santa Fe case, that the district considered the totality of the history, what was going on with the press, the response of the parents in terms of how their children, for example, had felt they had to join, or they might not get playing time, or they might have been considered outliers, if you will, in its actions? We cannot, from the district's perspective, take an isolated letter like your opponent has suggested. Yes, I agree, Your Honor. This was a complex situation for the district. Those letters could have been five times as long as they were, and they would not have covered everything that was a consideration for the district. And I'm not exaggerating. I believe that all of the judges have enough experience in this world to know the kind of passions that religion can ignite. I'm not exaggerating the concerns that the district had with the evolving situation and its need to do something to protect not just the rights of the students, but the students themselves. And we have submitted the declaration of the head coach, who was approached by people on the another coach on his way to the field, was concerned about being shot from the stands, and ultimately quit his job. After 11 years, he resigned because he didn't want to be part of that. And he said that he was concerned for the safety of his players, the safety of the band members, the safety of the cheerleaders. None of that's all laid out in the letters. And like I said, they could have written a legal brief and not covered everything here. But the fact that the district was facing a complex solution and doing its best on the fly to handle a situation where the coach insisted on continuing, saying he was going to continue his prior practice, and refusing to talk to the district at all about what he was, about accommodation, about what he was doing. The district, I think you can put your nose too deep into each line by line of what's in those letters. The big picture here is that the district was confronted with a situation, and if you look at this picture in ER 7479, the last picture of the last event, the district was faced with a situation where, regardless of intention, this is what the crowd saw. And that conveys a message. Even without the context of everything, it conveys a message. But especially in the context of the time, the coach and this activity on the field are conveying a message. The cheerleaders, the band members, and that is what the district had a legitimate concern about. It's not some isolated, private, personal event that's taking place. It is a staged communication to upwards of a thousand people attended these games. But what if there's a dispute of fact about that? Opposing counsel says that there was more discovery and that, what they've established is that Coach Kennedy did not subjectively intend to be pressuring the students or inviting them. It sounds to me like what you're saying is his subjective intent doesn't matter because we look at what a reasonable observer would understand. But I don't want to put words in your mouth. I want to make sure I'm following your outline. Precisely, Your Honor. The concern of the district is, look at this picture. What do you see? Not what his intentions are, but what are the consequences of his actions. ER 7479. 479, correct. That's what was seen from the stands. That's what the students saw. They got a message, whether he subjectively intended that message or not. My time's up. Very well. Okay. The time is up. Do either of my colleagues have additional questions for Mr. Kearney? I do not. Very well. Thank you, Mr. Kearney. We'll now hear from Mr. Katsky for seven minutes, please. Thank you, Your Honor, and may it please the court. There are hard cases that challenge courts to figure out where precisely to draw difficult lines, but this just isn't one. Discovery confirmed what the panel determined last time around. The school district had an employee in a position of tremendous authority and influence who was asserting an beliefs. It did everything it could to accommodate him while upholding its duty to protect the students against religious coercion. Students who were as young as 13 and 14 years old. So this case isn't about the heavy hand of government suppressing religion. It's about a responsible school district doing what it should to respect everyone's religious freedom, coaches and students alike. And the facts matter, and they are as the panel has recognized. So I do that because we are really familiar with the facts with respect to the Supreme Court, at least for the justices seem to indicate that this is a tougher line to draw. Do you want to talk about that? Because I guarantee you we need to engage in that feedback. Yes, Your Honor. And I think that that and I think that that comes down to the facts. What it comes down to a number of critical things. For instance, Judge Smith brought up the October 14 letter demand letter from Kennedy to this to the school district. It's ER 258. Kennedy demanded that he be allowed to continue his practice of audible prayers. Those were his words. And actually, that practice was years of prayer and religious speeches to both teams on the field. So that's the context in which the district had to understand Kennedy's demands and balance them against the rights of the students and their families. We also have the evidence of the actual coercion. ER 379 and 80 is one of the places with the student whose father complained to the principal that his son was a nonbeliever but felt like he had to go along. That speaks to what Justice Alito was questioning as well. The other thing is is is the accommodation efforts. Kennedy himself testified that the him. That's ER 367. The district offered him a private location to pray before and after the games. ER 100. He didn't want that. The court has already talked about the he could pray on the field after the event was completed. He did that whether it was once or a few times and then decided it wasn't good enough. The superintendent invited him to meet so they could work out other solutions. ER 190 and he wouldn't meet. The question is sort of what more could the district have have done. There's all there's as far as as Justice Alito's questions about silent devotional acts. Look in the first instance silent devotional acts can still coerce student participation especially when they're performative acts like being on the 50-yard line bowing and kneeling and clasping your hands in front of the cameras and everything else and when you've gone to the media and announced what you're going to do and when big crowds are attracted like at the October 16th game and they join you. But really the court doesn't even need to engage with any of that because Kennedy's again Kennedy's October 14th letter acknowledged that this wasn't silent prayer that wasn't what he was actually asking to do when he made his demand so so so the court doesn't need to worry about that and it speaks to what Justice Alito was concerned about. Judge Kristen you also brought up a question about the job duties earlier and I wanted to say something about that because at least in his brief what Kennedy argues is that is something like this that makes it personal and private. That just doesn't make sense. It's true that a job duty can't be overly expansive but it also can't be that an employee can can do that anything an employee wants to do that the school doesn't want the employee to do is by definition personal and private and if you know what a coach is and if you know what it means to be a coach on the 50-yard line after the game you know that this isn't one of those situations. Also Judge Smith you brought a question about Lukumi and I wanted to speak to that. Strict scrutiny applies under Lukumi if and I'm going to read it the object of the governmental action is to restrict practices because of their religious motivation. Now that didn't happen here. The district acted to protect the religious freedom of all the students by equally regulating all the conduct by teachers and coaches that might put pressure on students with respect to religion on Kennedy's view. So it doesn't that mean counsel counsel you're skipping over that pretty quickly. You think they weren't the district wasn't concerned about the religious nature of the speech or the conduct? Yes your honor but but that's but that's not the that's not the touchstone for this reason. Kennedy's view is something like a policy that teachers should respect all students religious beliefs impermissibly singles out because it mentions it. That's not what Lukumi is about. It's not what the legal standard is. The subject is religion absolutely and that's what and that's what the court is pointing to but it isn't disfavoring religion. Non-religious teachers can't act in ways that would discourage students from practicing their faith either. It's religious neutrality. It's not animus and that's the standard is ordinary rational basis review and more than that it's it's Johnson schools have to be entitled to control their own speech and manage their employees to ensure that the school remains religiously neutral and that's really what the standard is here. On these facts what the district did wasn't just. Can I ask a follow-up question? Forgive me for interrupting but you mentioned that and I was I have a lot of notes here about the audible nature of some of the prayers and Judge Smith's earlier comment or question probed that these were Christian prayers. So when we think about neutrality whether these were neutral do we know that the audible prayers were specifically Christian in nature? I don't know that we know the specifics of what he had historically given were religious and Christian. That's in the record but we also know that. Where is that in the record? Forgive me where is that in the record? Did he said and did he say as much in his media appearances? I'm not sure that I know that. I don't know that your honor. I will have to look at the record and I'm happy to send the court. All right. What he did say to the media among other things is he said everybody on the team knows where I stand on matters of faith. That's ER 452 and bowing kneeling and clasping your hands that alone whatever might be said is distinctly Christian. We talk about that a little bit in our amicus brief and in the one we filed last time around as well. That's not how people of other faiths pray. That is going to be and and that's just the nature. He was he was asking forgive me but he was asking to go back to audible prayers. Was he also asking to go back to to be able to to to to for it to manifest that way that he take a knee and bow his head? Well what he said he wanted to do was to continue his practice which he described as audible prayers and then we know what he did which is to which is to bow and kneel and clasp his hands. Thank you. On these facts what the district did wasn't just permissible. We think it's required because it's how the constitution protects religious freedom for everyone. We don't let public employees do what they want whenever they want not because we disrespect their beliefs not because we disfavor religion but because everyone's religious freedom is what matters. Council um you're over time so let me just ask both my colleagues do either of my colleagues have additional questions for Mr. Cassidy. Well thank we're going to give you a couple of minutes to respond. Your opponents have had first 30 minutes but they've raised some points that you may wish to address so we'll give you two minutes. Please proceed. Thank you Judge Smith. I appreciate that. Let me make three points. I think on point number one I want to point the court back to what the district actually told Coach Kennedy and I heard the district say that we're doing cherry picking or excerpts or anything like that. If you actually look at each of the three pieces of correspondence that were offered by the district on October 23rd on October 28th the letter that precipitated his suspension that one is at ER 277 and at the district's public questions and answers that it issued following uh its decision and you can have let me ask you this because to me this is important. The the district has indicated and so far as I can tell a record says that the letter from the lawyer said what what Coach Kennedy was going to do. The district claimed that it tried to get an accommodation and there was never any response except through the press. What is your response to that? Did he try to reach an accommodation with the district and if so where is that in the record? Sure so the the we sent the letter the district responded offering the two accommodations of having him pray elsewhere. Coach Kennedy said that was not acceptable and that's where the conversation with the district never he said that in a letter or he said that orally or how did he respond? I believe your honor that would have come uh orally. I don't know that there is a subsequent letter in the record right now. Okay so it is that is correct then that you got the letter from the anything besides what's in the record on that. Is that correct? That's correct we've got the record is what the record is on that point your honor but when we're talking about the strictest scrutiny which is what we apply to the free exercise claim under Espinosa and Trinity Lutheran the burden is on the district not on the person seeking to exercise their free exercise rights to develop an accommodation and so to the extent there is a narrow tailoring issue here that's a problem that lies with the district's policy and again I'll direct what what should they have done counsel. I think there was room to maneuver here as coach Kennedy testified he would have been okay waiting three to five minutes to allow the student athletes to completely depart the field and head to the locker room. He said that would have been fine that wouldn't have been he didn't want to depart with them the district says that he's supposed to supervise at least you know walk back to the so so you're you're thinking the district should have been required to at least allow him to stay back for five minutes is that to do his prayer at the field on the field? I district has proven as it must under strict scrutiny that that wouldn't that that would have posed a problem maybe the district will say no that's still a problem because there are still members of the public and students who can see him engaged in that activity even if students aren't there and fundamentally that's the policy that was being enforced against coach Kennedy and which prevented him from continuing to serve as a coach and I think the district was consistent and clear that it was the nature of that he was engaged in demonstrative religious activity on the job while visible that shows up in all the correspondence the district telling consistent message it's not referencing a spectacle it's not referencing the fact that he appeared in the media the district knew why it took its action it thought that in superintendent Lovell's words this personal private prayer silent at the 50-yard line posed an establishment clause issue that was incorrect. I know that you would have much more to say very able counsel but let me just ask my two colleagues whether either has additional questions for Mr. Anderson. No thank you. I so appreciate the argument of all counsel today. Yes indeed thanks to all counsel we really appreciate this obviously is the case that's important and we know that there are at least four members of the supreme court who are particularly focused on it and so we will do our best. We thank all counsel for argument the case just argued is submitted and the court stands adjourned for the thank you your honors thank you session stands adjourned
judges: D.W. Nelson, M. Smith, Christen